Filed 10/7/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF MADERA COUNTY,<br><br>Respondent;<br><br>CHAVON ABRAMS, et al.,<br><br>Real Parties in Interest. | F087132<br><br>(Super. Ct. Nos. MCV074874, MCV074987)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of mandate. Michael J. Jurkovich, Judge.

Pacific Employment Law; Schroeder Schaff & Low, Joseph P. Mascovich and Jason W. Schaaf, for Petitioner.

No appearance for Respondent.

The Homampour Law Firm, Arash Homampour, Wendi O'Wagner, Corey Arzoumanian, Nareen Touloumdjian; Law Office of Lee C. Arter and Lee C. Arter; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Real Parties in Interest.

-ooOoo-

Robert and Elise Sandiford, deceased, and Deon Detes Abrams, Sr., deceased, (collectively, decedents) perished after their respective vehicles collided on State Route 99 (SR 99), veered off the roadway, struck a tree located on abutting land owned by petitioner Union Pacific Railroad Company (Union Pacific), and burst into flames. In two consolidated lawsuits, relatives of the Sandifords (Sandiford plaintiffs) and relatives of Abrams (Abrams plaintiffs) (collectively, plaintiffs) sued Union Pacific alleging it was negligent for failing to remove the tree or failing to take other measures to protect the public against the dangerous condition caused by the tree.

Union Pacific moved for summary judgment contending, among other things, that plaintiffs cannot establish Union Pacific owed plaintiffs or decedents a duty to remove the tree. The trial court, applying factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), found the undisputed material facts did not warrant creating a judicial exception to the ordinary duty of care embodied in Civil Code section 1714 and denied the motion. Union Pacific then filed a petition for a writ of mandate, prohibition or other appropriate writ with this court, and we issued an order to show cause (OSC).

We hold Union Pacific did not have a duty to remove the tree or to otherwise take measures to protect the driving public from any alleged dangerous condition posed by the tree. Therefore, we grant the writ petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    Factual Background**

**A.    *Undisputed Facts Asserted by Union Pacific***

The following facts are undisputed for purposes of the summary judgment motion unless otherwise indicated.

On May 25, 2016, Robert and Elise Sandiford (decedents Sandiford) were traveling northbound on SR 99 in the County of Madera in a Coachman Leprechaun motorhome. Deon Detes Abrams, Sr. (decedent Abrams) was also driving northbound on SR 99 when decedents Sandiford's vehicle collided with his Freightliner truck, which

2.

was hauling a loaded trailer.  As a result, both vehicles veered off SR 99 and struck a tree located on abutting land east of the highway, killing the occupants of both vehicles.

Union Pacific owns the land on which the tree was located, having acquired it in 1998 through a merger with Southern Pacific Transportation Company.[1]  The land consists of a 100-foot wide corridor that runs parallel to SR 99.  Union Pacific's railroad tracks are located within the corridor and Union Pacific's right-of-way extends 50 feet on each side of the tracks' centerline.  The subject tree was located on the east side of SR 99, at least 20.7 feet from the closest lane of travel and approximately 42.6 feet from the centerline of Union Pacific's railroad tracks.

The tree had been growing in place for more than 74 years prior to the subject incident.  Although SR 99 was, at the time and location of the incident, a four-lane highway with two southbound lanes and two northbound lanes, a historical photograph from 1946 shows the tree in existence when SR 99 was only a two lane highway with one lane in each direction.[2]

Prior to the subject incident, Union Pacific had routinely inspected the area where the collision occurred as part of its inspection of its tracks and adjacent lands.  Union Pacific inspected the area "more than 100 times a year for many years before the subject [incident]."

Union Pacific claimed it was undisputed that it (1) had no agreements with the California Department of Transportation (Caltrans) "that would govern the land where the … tree was located"; (2) had "not received any correspondence … from any public entity, including [Caltrans], regarding the … tree"; and (3) had "no record evidencing any

[1] Caltrans removed the tree in 2021, five years after the subject incident, as part of a project to widen SR 99.

[2] Plaintiffs dispute any inference that the widening of the highway to four lanes resulted in a significant change in the distance between SR 99 and the tree.  We agree.  No evidence was provided to establish the distance of the tree from SR 99 when SR 99 was only a two-lane highway.

3.

other car accident, or other safety complaint or concern, regarding or involving the … tree." Plaintiffs objected to these asserted facts but did not produce any evidence to rebut them. The trial court did not rule on the objections. For reasons discussed in section II of the DISCUSSION section of this opinion, we accept the evidence underlying these asserted facts for purposes of review.

### B.  Additional Undisputed Facts Asserted by Plaintiffs

The Sandiford plaintiffs asserted 46 additional purported facts, and the Abrams plaintiffs asserted 38 additional purported facts, that they contend are material to Union Pacific's summary judgment motion. There is considerable overlap of those asserted facts, some of which were admitted by Union Pacific and discussed in the preceding section of this opinion. We summarize the remainder of those asserted facts below.

Plaintiffs contend (1) a 2012 Caltrans Traffic Manual states, "Studies have indicated that on high-speed highways, a clear width of 30 feet from the edge of the traveled way permits about 80 percent of the errant vehicles that leave the traveled way to recover. Thirty feet should be considered the minimum clear recovery zone[3] where possible for freeways and high-speed expressways[]" (italics and underling omitted); (2) a Caltrans 2010 Preliminary Investigation states, "To minimize the severity of run-off-road collisions of vehicles with trees, departments of transportation … commonly establish clear zones for trees and other fixed objects. Caltrans'[s] clear zone on freeways is 30 feet minimum (40 feet preferred) from the edge of travel way to a fixed object[]"; (3) for freeways and expressways, Caltrans's 2018 Highway Design Manual requires that it establish a minimum 30-foot clearance (and recommends a greater clearance of 40 feet or more) between the edge of a traveled way and any large trees (i.e., trees that "have trunks 4 inches or greater in diameter measured 4 feet above the ground")

---

[3] The concept of a "clear recovery zone" (sometimes, "CRZ") is described in Caltrans's 2018 Highway Design Manual as "an area for errant vehicles to potentially regain control."

4.

in order "[t]o keep the clear recovery zone free of physical obstructions."  The diameter of the subject tree was measured at 8.0 feet; (4) other national organizations concerned with highway safety recommend a "30 to 32 foot clear zone for flat, level terrain adjacent to a straight section of a 60 mph highway with an average daily traffic of 6,000 vehicles"; (5) the Insurance Institute for Highway Safety's website in 2019 stated, "Trees are the most common fixed object struck….  In 2018, [forty-eight] percent of deaths in fixed object crashes involved a vehicle striking a tree[]"; (6) Union Pacific had the power, authority, and ability to eliminate any dangerous condition posed by the subject tree; (7) Union Pacific was aware of the existence of the tree for decades; (8) Union Pacific had ample opportunity to remove the tree; (9) the tree served no purpose for the railroad; (10) nothing prevented Union Pacific from attempting to work with Caltrans to guard against any hazardous condition posed by the tree; (11) the tree "affirmatively contributed" to the fatal injuries suffered by decedents; (12) Union Pacific's manager of track maintenance and former track supervisor acknowledged that cars travel at speeds of 60 to 70 miles per hour on the section of SR 99 adjacent to the subject tree and that it is possible for a vehicle to go off the roadway for a variety of reasons; and (13)  Union Pacific's Engineering Track Maintenance Field Handbook requires its employees to conduct  "annual inspection[s] to observe conditions on and adjacent to [its] right of way, including vegetation."

Union Pacific has admitted some of the above facts and has objected to others. The trial court did not rule on Union Pacific's objections.  For reasons discussed in section II of the DISCUSSION section of this opinion, we accept the evidence underlying the asserted facts for purposes of review.

### C.    *Judicially Noticed Matter*

The trial court granted Union Pacific's request to judicially notice a Caltrans manual but denied its request to judicially notice other documents.  Union Pacific does not challenge these rulings by the court.  Unfortunately, the record on appeal does not

5.

contain a copy of Union Pacific's request for judicial notice or the documents submitted in connection therewith. Therefore, we cannot consider it. It is an appellant's affirmative duty to provide an adequate record for review. (*Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435.)

## II.     Procedural Background

Real parties in interest, plaintiffs herein, are the children of decedents Sandiford[4] and the wife and children of decedent Abrams.[5]  In two separate lawsuits, the Sandiford plaintiffs and Abrams plaintiffs, respectively, sued Union Pacific alleging the subject tree constituted an inherently dangerous condition on its land and that Union Pacific was negligent in its maintenance of its property and for allowing the tree to exist in its location.[6]  The two lawsuits were consolidated by the trial court.

Union Pacific moved for summary judgment contending plaintiffs could not establish Union Pacific "owed a duty to the decedents or the [p]laintiffs to remove [the] tree on its private property[.]"[7]

On September 28, 2023, the trial court issued its tentative ruling to deny Union Pacific's motion. On October 9, 2023, the court issued its order denying the motion and adopting its tentative ruling. Notice of entry of the order was served the following day.

---

[4] The Sandiford plaintiffs are real parties in interest Kira Dionne Sandiford and Devon Sandiford.

[5] The Abrams plaintiffs are real parties in interest Chavon Abrams; Zuri Abrams (a minor by and through her guardian ad litem (GAL), Chavon Abrams); Deon D. Abrams II; Deondra Abrams; Deondre Abrams; De'shon Abrams; Bonitaregina Mary Abrams and Deon D. Abrams III (minors by and through their GAL Mary Esther Johnson).

[6] The Sandiford plaintiffs also sued the State of California (including Caltrans) and the County of Madera. The Abrams plaintiffs also sued Caltrans and the estates of both Robert Sandiford and Elise Sandiford.

[7] Union Pacific asserted additional grounds for summary judgment but has not raised any issue with respect thereto in these writ proceedings.

On October 27, 2023, the trial court granted Union Pacific an extension of time to November 9, 2023, to file a petition for writ of mandate. (Code Civ. Proc., § 437c(m)(1).)

On November 9, 2023, Union Pacific sought review of the trial court's order by filing a petition for writ of mandate, prohibition, or other appropriate writ. In its petition, Union Pacific asks this court to "address a fundamental issue regarding whether landowners have a duty to protect errant motorists by keeping their property free of trees and similar obstructions."

Plaintiffs filed a preliminary opposition to Union Pacific's petition and Union Pacific filed its reply thereto.

On February 8, 2024, this court issued an order directing the issuance of an OSC. An OSC issued that same day.

On March 8, 2024, plaintiffs filed their return. On April 5, 2024, Union Pacific filed its reply to plaintiffs' return.

## DISCUSSION

### I. Standard of Review

" 'An order denying a motion for summary judgment may be reviewed by way of a petition for writ of mandamus. [Citations.] " 'Where the facts are undisputed and the law establishes the right of a party to an order or to the relief which the court has refused, the writ will lie.' " [Citation.] A writ of mandamus will issue when the denial of a motion for summary judgment results in a trial on a nonactionable claim.' " (*Irvine Company LLC v. Superior Court of Orange County* (2023) 96 Cal.App.5th 858, 869 (*Irvine*).)

" ' "On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law." [Citation.] We review the entire record, "considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and

7.

sustained." [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. [Citation.] [¶] Summary judgment is appropriate only "where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law." [Citation.] A defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action.' " (*Irvine*, *supra*, 96 Cal.App.5th at p. 869.)

"Duty, being a question of law, is particularly amenable to resolution by summary judgment." ' " (*Irvine*, *supra*, 96 Cal.App.5th at p. 869, italics omitted.) "Duty is a question of law for the court, to be reviewed de novo on appeal." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770 (*Cabral*).)

## II. Resolution of Objections to Facts Asserted by the Parties

As mentioned, plaintiffs and Union Pacific asserted objections to each other's alleged "undisputed material facts" but the trial court did not rule on the objections. In the context of a summary judgment motion, "if the trial court fails to rule expressly on specific evidentiary objections, it is presumed that the objections have been overruled, the trial court considered the evidence in ruling on the merits of the summary judgment motion, and the objections are preserved on appeal." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 (*Reid*).) However, "*the burden [is] on the objector to renew the objections in the appellate court*." (*Ibid*., italics added.)

In 2015, the Legislature amended the summary judgment statute to codify parts of the *Reid* decision. (Sen. Bill No. 470 (2015–2016 Reg. Sess.) § 1; Assem. Com. on Judiciary, Analysis of Sen. Bill. No. 470 (2015–2016 Reg. Sess.) June 16, 2015 [hearing date].) The amendment added current subdivision (q) to the statute, which provides: "In granting or denying a motion for summary judgment or summary adjudication, the court need rule only on those objections to evidence that it deems material to its disposition of the motion. Objections to evidence that are not ruled on for purposes of the motion shall

be preserved for appellate review." (Code Civ. Proc., § 437c, subd. (q); Sen. Bill No. 470 (2015–2016 Reg. Sess.) § 1.)

In a California Bill Analysis of Senate Bill 470, the Assembly Committee on Judiciary wrote: "The bill codifies two holdings from … *Reid v. Google, Inc.* …. First, the bill would allow the court, … when granting or denying a motion for summary judgment …, to only rule on those objections to evidence which it deems material to the disposition of the motion…. Second, this bill provides that any objection to evidence on which the court does not rule at a hearing for a motion for summary judgment … is deemed to be overruled and the issue of the court's ruling on such objection is preserved for appeal." (Assem. Com. on Judiciary, Analysis of Sen. Bill. No. 470 (2015–2016 Reg. Sess.) June 16, 2015 [hearing date].) Although the text of the amendment and of the resulting statute do not expressly state that objections not ruled upon are deemed overruled, that is the preferred approach adopted in *Reid*. (*Reid*, *supra*, 50 Cal.4th at p. 534.) Moreover, that approach is consistent with subdivision (c) of Code of Civil Procedure section 437c, which provides, in part: "In determining if the papers show that there is no triable issue as to any material fact, *the court shall consider all of the evidence* set forth in the papers, *except the evidence to which objections have been made and sustained* by the court …." (Code Civ. Proc., § 437c, subd. (c), italics added; *Reid*, at p. 534 ["presumed overruled approach … is consistent with [Code of Civil Procedure] section 437c, subdivision (c)"].)

Because the trial court did not expressly rule on any of the parties' objections, they are presumed to have been overruled. (*Reid*, *supra*, 50 Cal.4th at p. 534.) No party to these proceedings has renewed its objections. Consequently, the parties' proffered evidence remains part of the record on appeal for consideration by this court in its de novo review. (Code Civ. Proc., § 437c, subd. (c); *Reid*, at p. 534; *Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 183 [objections not ruled on and not renewed on appeal are disregarded].)

9.

## III. The Question Presented

In its writ petition, Union Pacific asks this court to "hold that Union Pacific did not have a duty to remove the tree on its land." Plaintiffs contend Union Pacific has incorrectly framed the issue by suggesting it was not already under a duty to keep its property in reasonably safe condition. They argue Civil Code section 1714 already imposes such a duty of care on Union Pacific. That code section provides, in relevant part: "Everyone is responsible … for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property …, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." (Civ. Code, § 1714, subd. (a).)[8]

Plaintiffs correctly note that in *Sprecher v. Adamson Companies* (1981) 30 Cal.3d 358, our state high court rejected prior common law that had "immunized a possessor of land from liability for injury caused by a natural condition of his land to persons or property not on his land." (*Id*., at pp. 360, 371.) *Sprecher* abolished any distinction between artificial and natural conditions with regard to a landowner's duty of care to keep its property in reasonably safe condition, and held that a landowner's liability for negligence must be determined according to ordinary principles of negligence. (*Id*., at p. 371.) Thus, regardless of whether an injury is caused by a natural condition or a man-made condition, a landowner will generally be responsible "for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." (§ 1714, subd. (a); *Sprecher*, at p. 371.)

Plaintiffs further contend that Union Pacific's manner of framing the issue conflates the concepts of duty and breach, arguing that "a finding that [Union Pacific] owed a duty [to remove the tree] would [have been] tantamount to a finding of liability.

---

[8] All statutory references are to the Civil Code unless otherwise noted.

10.

Yet, plaintiffs have largely premised their negligence claims against Union Pacific based on its failure to remove the tree.[9]

It is proper for this court to consider the scope of the duty asserted by plaintiffs in determining whether such a duty exists. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214 (*Castaneda*); *Garcia v. Paramount Citrus Assn., Inc.* (2008) 164 Cal.App.4th 1448, 1454.) " 'Only after the scope of the duty under consideration is defined may a court meaningfully undertake the balancing analysis of the risks and burdens present in a given case to determine whether the specific obligations should or should not be imposed ….' " (*Castaneda*, at p. 1214; see also *Gilead Tenofovir Cases* (2024) 98 Cal.App.5th 911, 921 ["it is generally more appropriate to consider the claimed duty in its factual context"].)

Importantly, Union Pacific has acknowledged the general application of section 1714 to the case before us, and has addressed the factors that must be considered

---

[9] For example, plaintiffs argued the trial court should deny Union Pacific's motion because "Union Pacific breached the duty it owes to plaintiffs and their decedents *by allowing the tree to exist* on its land so close to [SR] 99." (Italics added.) Plaintiffs wrote: "As the undisputed owner of the property where the tree was, Union Pacific 'may be held liable … *[for allowing] a fixed object* where it is reasonably foreseeable that persons traveling with reasonable care would deviate from the highway in the ordinary course of travel.' " (Bracketed language in original, italics added.) Notably, plaintiffs also wrote: "*Union Pacific only has to remove trees from its land that are too close to high-speed highways or otherwise pose a danger* to passing motorists, which likely applies to only a small fraction of the land it owns." (Italics added.)

Although plaintiffs' track safety expert, Alan Blackwell, suggested Union Pacific might have "[a]t the very least" worked with Caltrans to "ensure barriers were placed to prevent the intrusion of errant highway vehicles from accessing the railroad right-of-way, fouling the … track facilities and thereby interfering with train operations," he argued actual removal of the tree was necessary to protect the motoring public. Plaintiffs' civil engineering expert, Shakir Shatnawi, Ph.D., P.E., also stated that vehicle crashes of the type at issue here may be "prevented with adequate barrier protection or tree removal." Yet, materials relied upon by Shatnawi state, "Any nontraversable object (like trees) that warrant shielding by a barrier, *should be considered for removal. If this is not practical, a barrier may be provided*," italics added. (Federal Highway Administration's (FHWA) Guide to Management of Roadside Trees, p. 38.) Here, nothing suggests it was impractical to remove the tree.

11.

in determining whether an exception to section 1714 is warranted. As a result, we do not view Union Pacific's phrasing of the issue as problematic. It does not prevent us from conducting an appropriate analysis of the issue.

## IV.    Analysis

### A.    Negligence and the Duty of Care

"The elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 279.)

"Under general negligence principles … a person ordinarily is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct. [Citations.] [O]ne's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person." (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716.)

Section 1714 codified the general principles of negligence. (*Bonner v. Workers' Comp. Appeals Bd.* (1990) 225 Cal.App.3d 1023, 1034.) To reiterate, section 1714 provides, in relevant part: "Everyone is responsible … for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property …, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself…." (§ 1714, subd. (a).) However, a landowner's "responsibility is not absolute, or based on a duty to keep the premises absolutely safe.

12.

[Citation.]  The law does not impose a duty of extraordinary care."  (*Brunelle v. Signore* (1989) 215 Cal.App.3d 122, 131.)

"The existence of a duty is not an immutable fact of nature, but rather an expression of policy considerations providing legal protection."  (*Shin v. Ahn* (2007) 42 Cal.4th 482, 488.)  "A duty exists only if ' "the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' "  (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213).)

### B.      Rowland

The *Rowland* court set out seven non-exclusive factors that should be considered in determining whether to create a judicial exception to the general duty of care articulated in section 1714.  (*Rowland*, *supra*, 69 Cal.2d at p. 113.)  Those factors are (1) "the foreseeability of harm to the plaintiff"; (2) "the degree of certainty that the plaintiff suffered injury"; (3) "the closeness of the connection between the defendant's conduct and the injury suffered"; (4) "the moral blame attached to the defendant's conduct"; (5) "the policy of preventing future harm"; (6) "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach"; and (7) "the availability, cost, and prevalence of insurance for the risk involved."  (*Ibid*.)

The first three *Rowland* factors relate to foreseeability and the remaining four pertain to public policy considerations.  (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145.)  As stated in *Rowland* and other California Supreme Court cases, "it is clear that in the absence of a statutory provision declaring an exception to the fundamental principle enunciated by section 1714 …, no such exception should be made *unless clearly supported by public policy*."  (*Rowland*, *supra*, 69 Cal.2d at p. 112, italics added; *Kesner*, at p. 1144; *Cabral*, *supra*, 51 Cal.4th at p. 771.)

"[T]he *Rowland* factors are evaluated at a relatively broad level of factual generality."  (*Cabral*, *supra*, 51 Cal.4th at p. 772.)  "[T]he legal decision that an

13.

exception to … section 1714 is warranted, so that the defendant owed no duty to the plaintiff, or owed only a limited duty, *is to be made on a more general basis suitable to the formulation of a legal rule ….*" (*Cabral*, *supra*, 51 Cal.4th at p. 773, original italics omitted, italics added.) Thus, in applying the *Rowland* factors, we ask "whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." (*Id*., at p. 772.)

### C. *Rowland Foreseeability Factors*

#### 1. <u>Foreseeability</u>

"The foreseeability of the harm, though not determinative, has become the chief factor in duty analysis." (*Scott v. Chevron U.S.A.* (1992) 5 Cal.App.4th 510, 515 (*Scott*).) "An act must be *sufficiently likely* before it may be foreseeable in the legal sense. That does not mean simply imaginable or conceivable. Given enough imagination, *everything* is foreseeable… If the law imposed a duty to protect against every *conceivable* harm, nothing could function." (*Jefferson v. Qwik Korner Market, Inc.* (1994) 28 Cal.App.4th 990, 996.)

" '[A]s to foreseeability, ... the court's task in determining duty "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed...." ' [Citations.] ' "[F]oreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." ' " (*Kesner*, *supra*, 1 Cal.5th at p. 1145.)

Union Pacific contends the first three *Rowland* factors "provide no more than weak support for the trial court's duty ruling." It argues "foreseeability of harm from an obstacle on land bordering a highway is most significant when the obstacle is located quite close to the travel lanes," and states the subject tree "was located more than 20 feet

14.

from the closest travel lane and was outside the safe recovery zone Caltrans provided." Union Pacific acknowledges Caltrans's design manual "recommends use of 30-foot-wide clear recovery zones, if feasible" but contends "Caltrans presumably believed a 20-foot-wide zone was adequate."[10]

Union Pacific argues the existing clear recovery zone "has provided adequate protection for motorists" and states it "has no record of prior complaints or accidents involving the tree." No evidence was submitted to demonstrate otherwise. In addition, Union Pacific contends the area of SR 99 at issue is "configured in a relatively straight line with no unusual features"—a characterization supported by both parties' evidence—and is not inherently dangerous.

Finally, Union Pacific argues the foreseeability factor "cuts two ways." "For example," it states, "at a speed of just 40 miles per hour, a vehicle will travel approximately 60 feet per second," and, as a result, "obstructions located 40 feet or more from the highway's edge easily could be in the errant vehicle's path of travel."

Plaintiffs contend Union Pacific's acknowledgement that the foreseeability factors "provide … weak support for the trial court's duty ruling" is a concession that "the type of accident that occurred here … is foreseeable." They further contend that *Cabral*, *supra*, is instructive in that it "considered the issue of foreseeability in a factual context that parallels this case."

In *Cabral*, "[a] truck driver working for Ralphs Grocery Company (Ralphs) stopped his tractor-trailer rig alongside an interstate highway … to have a snack." (*Cabral*, *supra*, 51 Cal.4th at p. 768.) A sign installed by Caltrans demarcated the area for "Emergency Parking Only." (*Id*., at p. 769.) The driver "saw the sign from where he stopped, about 16 feet from the outermost traffic lane." (*Id*., at p. 769.) While the rig

---

[10] Caltrans's 2012 Traffic Manual states "a 30-foot CRZ may be difficult to justify for engineering, environmental or economic reasons. For these reasons, a minimum CRZ of 20 feet on conventional highways is advised."

was stopped, a pick-up truck veered off the freeway and "collided at high speed with the rear of the … trailer[.]" (*Ibid*.) After a jury found the Ralphs driver partially at fault for the incident, the Court of Appeal reversed and held "Ralphs owed no legal duty to avoid a collision between a negligent driver and the company's stopped truck." (*Ibid*.) The California Supreme Court reversed the judgment of the Court of Appeal. (*Id.*, at p. 787.) In doing so, it concluded it was "not categorically unforeseeable" that "drivers may lose control of their vehicles and leave a freeway for the shoulder area, where they may collide with any obstacle placed there." (*Id.*, at pp. 768, 787.) The high court wrote: "That [the Ralphs driver] parked 16 feet from the outermost traffic lane, rather than six feet or 26 feet; that parking for emergencies was permitted in the dirt area he chose; that [the pick-up driver] likely left the highway because he fell asleep or because of some unknown adverse health event, rather than from distraction or even intoxication—none of these are critical to whether [he] owed [the pick-up driver] a duty of ordinary care." (*Id.*, at p. 774.)

There are material similarities between *Cabral* and the instant case. Both involve a vehicle or vehicles veering off of a highway and crashing into a stationary object in relative proximity to the traffic lanes. The difference in the relative proximity of the alleged hazards at issue here (20.7 feet) and in *Cabral* (16 feet) to traffic lanes is not significant for purposes of determining foreseeability. (See *Cabral*, *supra*, 51 Cal.4th at p. 774.)

There are also differences between *Cabral* and the instant case with regard to foreseeability. For example, in *Cabral*, the allegedly negligent Ralphs driver was on notice that non-emergency parking was not permitted by virtue of a sign installed by Caltrans, whereas, here, there is no evidence Union Pacific was ever notified of an issue pertaining to the subject tree. Moreover, because Caltrans is designated as the responsible agency for highway design, construction, improvement, and maintenance (Sts. & Hy. Code, §§ 90–92, 143, subd. (f)(1)(A)), and has a duty, when on notice of a

16.

dangerous condition, to "take such protective and remedial measures as may be reasonably practical for the safety" of the motoring public (*Briggs v. State of California* (1971) 14 Cal.App.3d 489, 499, fn.5), the owner of highway-adjacent land might reasonably expect to be notified by Caltrans in the event a dangerous condition existed on the land. That owner might reasonably contend that, "in the setting of modern life … a reasonably thoughtful [person]" would not take account of an allegedly dangerous conditions in guiding his or her conduct absent such notification from Caltrans. (See *Kesner*, *supra*, 1 Cal.5th at p. 1145.)

Although there are differences between *Cabral* and the instant case with regard to foreseeability, we cannot conclude that incidents such as the subject incident are not foreseeable. [11] Consequently, for purposes of writ review, we presume this factor weighs against creating a judicial exception to the ordinary duty of care.

### 2. *Certainty of Injury*

The second foreseeability factor, i.e., the degree of certainty that the plaintiff suffered injury, "is relevant 'primarily, if not exclusively, when the only claimed injury is an intangible harm, such as emotional distress.' " (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1023 (*Kuciemba*).) Here, the claim is not intangible, and there is no dispute that plaintiffs suffered injury as a result of the subject incident. However, the relevance of this factor to the current case is placed in doubt by the foregoing statement in *Kuciemba*. Thus, we conclude this factor neither favors nor disfavors creating a judicial exception to the duty of ordinary care.

---

[11] Our foreseeability determination is in keeping with our high court's directive that "*Rowland* factors are evaluated at a relatively broad level of factual generality." (*Cabral*, *supra*, 51 Cal.4th at p. 772.) Had we been called upon to consider whether accidents of the *specific* type at issue here are foreseeable, our determination might have been different given the relatively unique and catastrophic nature of the subject incident.

*3.      Closeness of the Connection Between Union Pacific's Conduct and the Injury Suffered*

As to the third and final foreseeability factor—i.e., the closeness of the connection between Union Pacific's conduct and the injuries suffered by plaintiffs (or decedents)— Union Pacific concedes "[t]here is always a risk that two cars will collide on a highway, possibly resulting in serious injury or death to the drivers or passengers, whether or not some obstacle is located 20 feet from the edge of the highway." Union Pacific argues, however, "the tree did not increase the chances that motorists would lose control of their cars and leave the highway. Nor did Union Pacific have any control over the decedent drivers' behavior," citing, without discussion, *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1085–1086 (*Vasilenko*).

In *Vasilenko*, the plaintiff had parked in the defendant church's overflow parking lot and was struck by a car as he attempted to cross a public street in order to get to the church's main premises. (*Vasilenko*, *supra*, 3 Cal.5th at p. 1081.) He sued the church contending it "owed him a duty of care to assist him in safely crossing the public street." (*Ibid*.) The trial court granted summary judgment in favor of the church on grounds no duty was owed but the Court of Appeal reversed. (*Id.*, at p. 1083.) Our high court agreed with the trial court that no duty was owed and reversed the decision of the Court of Appeal. (*Id.*, at pp. 1082, 1098.)

The *Vasilenko* court wrote, "The third [*Rowland* foreseeability] factor … is 'strongly related to the question of foreseeability itself' [citation], but it also accounts for third-party or other intervening conduct. [Citation.] Where the third party's intervening conduct is foreseeable or derivative of the defendant's, then that conduct does not ' "diminish the closeness of the connection between defendant['s] conduct and plaintiff's injury." ' " (*Vasilenko*, *supra*, 3 Cal.5th at p. 1086.) The court wrote: "[U]nless the landowner impaired the driver's ability to see and react to crossing pedestrians, the driver's conduct is independent of the landowner's. Similarly, unless the landowner

18.

impaired the invitee's ability to see and react to passing motorists, the invitee's decision as to when, where, and how to cross is also independent of the landowner's." (*Ibid*.) Thus, the court determined there was "only an attenuated relationship to the invitee's injury" and "conclude[d] that the closeness factor tips against finding a duty." (*Ibid*.)

We agree there is no evidence before us that the tree increased the chances that a collision on SR 99 would occur, or that Union Pacific was able to control the decedent drivers' behaviors. However, the subject incident did occur, in part, on Union Pacific's land and there is evidence the subject tree was an instrumentality that contributed to decedents' deaths. The evidence tends to show (1) the decedents Sandiford's recreational vehicle struck decedent Abrams's Freightliner truck causing the vehicles to veer off the roadway and onto Union Pacific's land; (2) the recreational vehicle's left side (where its fuel components were located) struck the tree; (3) a fire ensued due to the catastrophic failure of the fuel components on both vehicles; (4) the fire did not start until the vehicles collided with the tree; (5) the "material first ignited was gasoline … released from the [recreational vehicle's] fuel system"; and (6) decedents Sandiford died as a result of "fire related injuries, including smoke inhalation."

Thus, there are facts to suggest a close connection between Union Pacific permitting the tree to remain on its land and decedents' deaths. We conclude this third foreseeability factor weighs against creating an exception to the duty of ordinary care.

### D. Rowland Policy Factors

"Even if the foreseeability factors of *Rowland* … weigh in favor of recognizing a duty of care, the courts 'must also consider whether public policy requires a different result.' [Citations.] 'A duty of care will not be held to exist even as to foreseeable injuries ... where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.' " (*Jabo v. YMCA of San Diego County* (2018) 27 Cal.App.5th 853, 885.) " '[S]ocial policy must at some point intervene to

19.

delimit liability' even for foreseeable injury [citation], and 'policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk.' " (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 476, italics omitted.)

### 1.    *Moral Blame*

" 'Moral blame has been applied to describe a defendant's culpability in terms of the defendant's state of mind and the inherently harmful nature of the defendant's acts.' " (*Martinez v. Bank of America Nat. Trust & Sav. Ass'n* (2000) 82 Cal.App.4th 883, 896 (*Martinez*).)  " '[T]his factor in the duty analysis is intended to describe a high degree of moral culpability beyond that associated with ordinary negligence.' " (*Day v. Lupo Vine Street, L.P.* (2018) 22 Cal.App.5th 62, 74–75.)  A "high[] degree of moral culpability" may be found "where the defendant (1) intended or planned the harmful result [citation]; (2) had actual or constructive knowledge of the harmful consequences of their behavior [citation]; (3) acted in bad faith or with a reckless indifference to the results of their conduct [citations]; or (4) engaged in inherently harmful acts.' " (*Martinez, supra,* at p. 896.)

Union Pacific argues it has no moral blame in this matter because it had "no responsibility for highway design, did not cause the highway collision at issue, and there had been no accidents involving the tree over the course of decades."  Union Pacific quotes *Scott* for the proposition "there is nothing inherently wrong with placing a fixed object on one's property."  (*Scott*, *supra*, 5 Cal.App.4th at p. 517.)

In response, plaintiffs contend Union Pacific's "conduct need not be highly blameworthy to satisfy this element" and note that in *Cabral*, where a duty was found, the high court stated, "a driver who negligently stops his or her vehicle alongside a freeway does not act in an especially blameworthy manner." (*Cabral*, *supra*, 51 Cal.4th at p. 782.)  The court observed that "no state or federal law encourages or authorizes drivers to stop their vehicles alongside an interstate highway" for nonemergency purposes.  (*Ibid*., italics omitted.)  The court summed up the point: "Stopping alongside

20.

the freeway for such discretionary purposes is hardly a heinous act, but neither does it receive any special legal protection." (*Ibid*.)

With regard to the moral blame factor, there are significant differences between the facts in *Cabral* and those of the present case. In *Cabral*, the Ralphs driver *actually created* the alleged hazard by parking in an unauthorized area (*Cabral*, *supra*, 51 Cal.4th at p. 782) whereas, here, there was no act on the part of Union Pacific that created the alleged hazard (e.g., by planting the tree near SR 99). Also in *Cabral*, *the Ralphs driver was arguably on notice he was creating a hazard* because he observed the Caltrans sign advising that only emergency parking was allowed (*Cabral*, at p. 769) whereas, here, there were no related warnings, postings, or other notifications that might have alerted Union Pacific to a dangerous condition caused by the subject tree. Finally, the *Cabral* court noted the *Ralphs driver could have been ticketed* for parking in an area designated for emergency parking only (*Cabral*, at p. 782) whereas, here, the alleged negligent act was not an infraction or other public offense.

Plaintiffs also contend "moral blame … can attach to [Union Pacific's] failure to take reasonable steps to avert foreseeable harm," citing *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 814 (*Peterson*). This statement does not accurately capture the bases for the *Peterson* court's finding of moral blame.

In *Peterson*, the plaintiff was assaulted on a stairway in a community college parking lot. (*Peterson*, *supra*, 36 Cal.3d at p. 805.) She alleged the perpetrator "used a modus operandi … similar to that used in previous attacks on the same stairway"; the school was "aware that other [similar] assaults … had occurred in that area and had taken steps to protect students"; and she had "relied upon this increased protection." (*Id*., at p. 805.) She also alleged a "special relationship" between her and the defendant school district giving rise to a duty to protect her or warn her of the danger. (*Id*., at p. 804.)

The defendant school district demurred on various grounds but the *Peterson* court concluded the "primary question … [was] whether under the facts as alleged the

21.

defendants owed her a duty of care." (*Peterson*, *supra*, 36 Cal.3d at p. 805.) After weighing the *Rowland* factors, the court held the plaintiffs' allegations were "sufficient to establish a common law duty of care" toward plaintiff. (*Id*., at p. 815.) The *Peterson* court's determination that the school district's alleged failure to act was morally blameworthy was not merely due to its failure to take reasonable steps to correct a foreseeable risk; it was also based on other factors including the defendants' knowledge of prior similar attacks and its subsequent failure to warn plaintiff of, or to take measures to protect the plaintiff against, a *known* danger. (*Ibid*.) Here, Union Pacific had no knowledge of prior similar incidents.

Moral blame may also be warranted in situations where the defendant reaps a financial benefit from risks it has created or knowingly allowed to exist. (*Kuciemba*, *supra*, 14 Cal.5th at pp. 1025–1026 [considering whether the defendant businesses financially benefitted from ignoring health and safety standards]; *Kesner*, *supra*, 1 Cal.5th at p. 1151 [moral blame found, in part, because "commercial users of asbestos benefitted financially from their use of asbestos and had greater information and control over the hazard than employees' households"].) Here, although Union Pacific arguably saved money or resources by not removing the tree, there is no evidence it did so in a conscious effort to avoid any duty to remove the tree.

Finally, "[r]elative inequality between the parties may also bear upon moral blame." (*Kuciemba*, *supra*, 14 Cal.5th at p. 1026.) " '[W]here the plaintiffs [or, in cases such as this, the decedents] are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue," courts have found moral blame. (*Ibid*., quoting *Kesner*, *supra*, 1 Cal.5th at p. 1151.) The parties have not argued, or submitted evidence tending to show, that decedents were particularly powerless or unsophisticated compared to Union Pacific in any meaningful way with regard to the alleged hazard posed by the subject tree. The driving public is sufficiently sophisticated to appreciate the risk of high-speed motor vehicle travel.

Moreover, the case cited in *Kesner* for the proposition that moral blame may be found where a defendant "exercised greater control over the risks at issue" was *Peterson*, discussed *ante*. (*Kesner*, at p. 1151, citing *Peterson*, 36 Cal.3d at p. 814.) As mentioned, moral blame was assigned in that case due, in part, to the fact the defendant was on notice of prior similar incidents. (*Peterson*, at p. 815.)

Here, Union Pacific did not create the alleged hazard, did not cause the collision between the decedents' two vehicles, was not on notice of the alleged risk posed by the tree as a result of any prior similar incidents or notifications from others, had no greater knowledge of the risk posed by the tree than did passing motorists, committed no infraction, public offense or any heinous act, and had no responsibility for the design of SR 99 or clear recovery zones. Moreover, there is no evidence it made a calculated decision not to remove the tree in order to obtain monetary gain or some other benefit.

We conclude no moral blame can be attributed to Union Pacific in this matter. Consequently, this factor weighs in favor of creating a judicial exception to the ordinary duty of care.

### 2. *The Policy of Preventing Future Harm*

Union Pacific contends the policy of preventing future harm "is most significant where the defendant is the entity 'best suited' to prevent the injury at issue." Union Pacific cites to *University of Southern California v. Superior Court* (2018) 30 Cal.App.5th 429 (*University*), disapproved on other grounds in *Brown v. USA Taekwondo*, *supra*, 11 Cal.5th 204, wherein it was stated,

> " 'The policy of preventing future harm is ordinarily served by allocating costs to those responsible for the injury and best suited to prevent it. [Citation.] "In general, internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer. That consideration may be 'outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.' " ' " (*University*, at p. 454, quoting *Vasilenko*, *supra*, 3 Cal.5th at p. 1087.)

23.

Union Pacific argues "only Caltrans has both the expertise to determine the attributes of a clear recovery zone that any portion of a highway might require and the ability to take appropriate steps to provide for the needed recovery zone."

In response, plaintiffs contend the policy of preventing future harm weighs against creating an exception to the general duty of care in this matter. Plaintiffs note that in *Kesner*, the court wrote: "In general, internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer." (*Kesner*, *supra*, 1 Cal.5th at p. 1150.) Plaintiffs further argue there are no laws or mores at play here that outweigh the policy of preventing future harm.

In this matter, we believe Union Pacific has the stronger argument. First, we agree that Caltrans has expertise in this matter that members of the public generally lack. This is due, in no small measure, to the fact that the Legislature has designated Caltrans as the responsible agency for the design, construction, improvement and maintenance of the highway system in California (Sts. & Hy. Code, §§ 91, 92, 143, subd. (f)(1)(A)), and has granted Caltrans "full possession and control of all state highways" and the State's rights therein. (*Id*., at § 90.) Likewise, it has given Caltrans the power to acquire land for highway purposes through eminent domain or other means (*id*., at §§ 102, 104), and Caltrans is subject to a duty, upon receiving notice of a dangerous condition, to "take such protective and remedial measures as may be reasonably practical for the safety" of highway users (*Briggs*, *supra*, 14 Cal.App.3d at p. 499, fn. 5). The Caltrans publications submitted by plaintiffs demonstrate that Caltrans employees are trained to recognize and address hazards posed by mature trees and other fixed objects.

Materials submitted by plaintiffs also demonstrate that numerous variables and engineering considerations must be taken into account in designing a clear recovery

zone.[12]  The same is true for installing barriers or guardrails.[13]  It is not reasonable to expect the lay public to have (or develop) the necessary expertise to properly ascertain and apply those variables.  If lay persons are required to make such calculations and judgments, it is relatively certain mistakes will be made, which could easily exacerbate potential dangers and result in greater risks to the motoring public.  Moreover, placing

[12]  For example, Caltrans's 2012 Traffic Manual states, "Site-specific conditions such as volume, speed, alignment, side slope, weather, and environmental conditions need to be considered when determining the CRZ."  Caltrans's 2018 Highway Design Manual sets a 30 to 40 foot setback from trees exceeding a certain size, but may be reduced "on cut slopes which are 2:1 or steeper."  In fact, 2011 design guidelines from the American Association of State Highway and Transportation Officials (AASHTO) provide different CRZ widths depending on (1) four different categories of average daily traffic (i.e., under 750, 750–1500, 1500–6000, and over 6000 vehicles), (2) five different design speeds (i.e., under 40 miles per hour (mph), 45–50 mph, 55 mph, 60 mph, and 65–70 mph), (3) three different categories of either foreslope or backslope (i.e., 1V:6H or flatter (we presume the V stands for vertical and H stands for height), 1V:5H to 1V:4H, and 1V:3H).  This list is but a sample of the variables and engineering considerations that experts take into account in determining a CRZ.

[13]  According to Federal Highway Administration (FHWA) guidelines, guardrails must be properly designed and installed according to AASHTO guidelines.  (FHWA's 1986 Guide to Management of Roadside Trees, p. 38)  A 2012 Caltrans Traffic Manual indicates different types of guardrails (i.e., metal beam guardrails, concrete barriers, and cable guardrails) may be used depending on the risk involved.  (2012 Caltrans Traffic Manual, § 7-03.2.)  Caltrans publications describe a number of variables and engineering considerations in the use of guardrails including collision history, roadway alignment, volume of traffic, speed of traffic, climate, the size or length of the guardrail, and its placement in relation to the highway.  (2012 Caltrans Traffic Manual, §§ 7-03.1–7-03.3; Caltrans's 2017 Traffic Safety Systems Guidance, p. 20.)  "Where guardrail is to be installed on an existing highway …, the conditions relating to the road-side feature should be verified, such as slopes, clearances, dimensions, underground utilities, and material."  (2012 Caltrans Traffic Manual, § 7.03.1.)  FHWA guidelines suggest guardrails to shield fixed objects (such as trees) should be resorted to only where removal of the obstruction is impractical.  (FHWA's 1986 Guide to Management of Roadside Trees, p. 38.)  In addition, FHWA guidelines caution: "Using a section of guardrail horizontally longer than the width of the tree … may create a greater problem than leaving the tree unprotected[,]" and guardrails "may actually increase the number of accidents … *particularly when the guardrail protects a narrow object such as a tree*," italics added.  (*Ibid.*)

25.

potential liability with landowners who lack such expertise may well create perverse incentives for Caltrans to avoid its responsibilities in making our highways safe in order to save on costs and/or spread potential liability to others who lack such expertise. Thus, the policy of preventing future harm may, in fact, be undermined were we to recognize a landowner duty in cases such as the one now before us.

Whether recognizing a duty on the part of Union Pacific and like-situated landowners would sufficiently incentivize private owners to clear their land of all stationary objects within 30 to 40 feet of an abutting highway is, at best, a dubious proposition. The cost for removing a single tree (i.e., the tree in question) was more than $3,300 per Caltrans.[14] It is not difficult to imagine that many affected landowners would be unable (or unwilling) to absorb the cost of removing all fixed objects within a suitable distance for a clear recovery zone. Thus, there may be little preventative benefit in recognizing a duty in matters such as this.

Based on the foregoing, we conclude the policy of preventing future harm weighs in favor of creating a judicial exception to the ordinary duty of care owed by landowners.

### 3. *Burden*

Union Pacific argues it is "common knowledge … that California has thousands of miles of roads and highways bordering private property that contains trees" and other "structures that could become an obstacle for an errant motorist." Union Pacific argues that cars often travel on such roads and highways "at or very close to freeway speeds," citing California Vehicle Code section 22349, which generally provides a maximum speed limit of 55 miles per hour for undivided two-lane highways. (Veh. Code, § 22349, subd. (b).) Union Pacific posits "the risk of injury for motorists traveling at higher speeds on a two-lane highway in a wooded area surely is at least as great as the risk

---

[14] As previously mentioned, Caltrans removed the tree in 2021, five years after the subject incident, as part of a project to widen SR 99. In discovery, Caltrans stated the cost to remove the tree was $3,339.96.

26.

associated with roads and freeways like SR 99." It then asks, "whether private landowners should be under a duty to remove these trees from their property lest they be exposed to potentially ruinous liability," and argues this court should answer the question in the negative.

Union Pacific has not presented evidence concerning the prevalence of trees bordering highways or the number of landowners that might be impacted if courts were to uphold a duty on their part to provide what amounts to an effective clear recovery zone. Moreover, Union Pacific has not requested this court judicially notice such facts. We will not do so sua sponte.[15]

Notably, a similar argument was made and rejected in *Cabral*, *supra*. In that case, defendant argued that "recognizing a duty to exercise care in parking alongside a freeway 'would have far-reaching consequences,' allowing for potential liability for … a landowner who places a fixed object such as a light post or mailbox next to a road if these vehicles or objects were later hit by a drunken or drowsy motorist on the road." (*Cabral*, *supra*, 51 Cal.4th at p. 783.) In rejecting the argument, our high court stated, " 'freeways are radically different in their purpose and design from other public roads,' making extrapolation of liability rules from freeways to other urban, suburban, or rural roads an uncertain exercise at best." (*Ibid*.) Given this statement in *Cabral*, and the lack of supporting evidence as to the prevalence of trees and other fixed objects along highways, we cannot make a burden determination on these grounds.

---

[15] Although one might readily acknowledge the prevalence of trees and other structures along, and in relative proximity to, California roads and highways (including SR 99), there are many other factors that impact whether, under plaintiffs' theory of the case, a landowner would be subject to a duty to remove, or protect the public from, those objects. (See, e.g., footnotes 12 and 13, *ante*.) Even were this court inclined to judicially notice the widespread presence of trees and structures along California's roads and highways, we would be hard-pressed to draw a broader conclusion concerning the impact of recognizing a duty in cases such as this on other owners of highway-adjacent land.

Union Pacific also relies on the following passage in *Scott*, *supra*, to argue in favor of this court creating an exception to the duty imposed by section 1714:

> "While future harm might be prevented by holding property owners responsible whenever a fixed object on their property contributes to injuries suffered on adjacent highways, we doubt that society is willing to so restrict property rights. *Imposing liability in these circumstances would effectively require landowners to dedicate a portion of their property as a safety zone to protect errant drivers.* [Citation.] We think that a decision to force property owners to protect the motoring public should be reached through legislative action rather than tort law."[16] (*Scott*, *supra*, 5 Cal.App.4th at p. 517, italics added.)

To this Union Pacific adds, "the state and other public entities may always exercise the power of eminent domain subject to payment of just compensation." It argues the Legislature is best suited to consider "all competing public policies, determine when wider clear recovery zones should be used, and, if necessary, provide funding to acquire the needed property." Aside from directing this court to comments made in *Scott* (as reflected in footnote 16 of this opinion), plaintiffs did not address this argument in their briefing to this court.

A similar point was made in the concurring and dissenting opinion in *Laabs v. Southern California Edison Co.* (2009) 175 Cal.App.4th 1250 (*Laabs*)—a case involving a two-vehicle collision at an intersection of two city streets. (*Id*., at p. 1264.) There, the passenger in one of the vehicles was injured when the collision caused one of the cars to veer off and hit "a concrete light pole erected 18 inches from the curb." (*Ibid*.) The *Laabs* court reversed a summary judgment in favor of Southern California Edison

---

**16** In a footnote, the *Scott* court clarified: "We do not mean to imply that a property owner is free to place an object next to a highway with no thought to the possible consequences. For example, property owners may be held liable if they obstruct views at an intersection [citation], or if they place a fixed object where it is reasonably foreseeable that persons traveling with reasonable care would deviate from the highway in the ordinary course of travel (see Rest. 2d Torts, § 368)." (*Scott*, *supra*, 5 Cal.App.4th at p. 517, fn. 3.)

Company concluding it had "not established under these circumstances the absence of a duty of care to plaintiff as a matter of law." (*Id*., at p. 1279.) The justice authoring the concurring and dissenting opinion, in considering public policy, wrote:

> " 'Carried to its logical conclusion [the majority's proposition] would require a landowner to remove every tree, fence, post, mailbox or name sign located on his property in the vicinity of the highway, or permit them to remain, subject to possible liability…. [¶] '[S]uch a rule would result in limiting the owner's use of that portion of his property which abuts the road, and *would be equivalent to a taking of private property for a public use without just compensation ….*' (*Hayes v. Malkan* (1970) 26 N.Y.2d 295, ….)" (*Laabs, supra*, 175 Cal.App.4th at p. 1295, (conc. & dis. opn. of Hollenhorst, J.), italics added.)

Our state Constitution provides, in part: "Private property may be taken or damaged for a public use and only when just compensation … has first been paid to, or into court for, the owner." (Cal. Const., Art. 1, § 19, subd. (a).) Our federal Constitution provides similarly. "The Takings Clause of the Fifth Amendment states: 'nor shall private property be taken for public use, without just compensation.' " (*DeVillier v. Texas* (2024) 601 U.S. 285, 291; U.S. Const., 5th Amend.)

"The fundamental concept that underlies the just compensation clause of the Fifth Amendment is that government cannot force some people alone to bear public burdens that, in fairness and justice, should be borne by the public as a whole." (7 Miller & Starr, Cal. Real Estate (4th ed 2024 update) Inverse Condemnation, § 23:24; *Massingill v. Department of Food & Agriculture* (2002) 102 Cal.App.4th 498, 505 [same, analyzing California and federal Constitutions' takings clauses].)

In *Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection* (2010) 560 U.S. 702 [130 S.Ct. 2592, 177 L.Ed.2d 184] (*Stop the Beach*), Justice Scalia, writing the plurality opinion, held the federal takings clause "bars *the State* from taking private property without paying for it, no matter which branch is the instrument of the taking…. [T]he particular state *actor* is irrelevant. If a Legislature *or a*

*court* declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation." (*Id.*, at p. 715.) As stated in *Surfrider Foundation v. Martins Beach 1, LLC* (2017) 14 Cal.App.5th 238 (*Surfrider*), "The lesson we take from *Stop the Beach* is that where it has been determined that a court action eliminates an established property right and would be considered a taking if done by the legislative or executive branches of government, it must be invalidated as unconstitutional, whether under the takings or due process clauses." (*Id.*, at p. 262 [considering takings under California and federal Constitutions].)

Other jurisdictions have grappled with issues similar to those presented here. For example, the court in *Hayes v. Malkan* (1970) 26 N.Y.2d 295 [258 N.E.2d 695] (*Malkan*), cited by the concurring/dissenting justice in *Laabs*, was faced with facts and legal questions similar to those in *Laabs*. In *Malkan*, the plaintiff was a passenger in a vehicle that struck a utility pole located on private property, approximately seven inches from the road on which the vehicle was driving. (*Malkan, supra*, 258 N.E.2d at p. 695.) The plaintiff sued and obtained a judgment against the defendant utility company that owned the utility pole. (*Id.*, at p. 697.) On appeal, New York's highest court ruled the trial court erred by "instruct[ing] the jury that 'the law imposes a duty upon the defendant … that the pole must be so located as to avoid unreasonable and unnecessary danger to travelers upon the highway, *regardless of whether it is on private or public property*.' " (*Id.*, at p. 695, italics in original.)

The *Malkan* court observed the court had taken the position in other cases that "placement of poles or other objects …, raises a question of fact for jury determination as to whether the placement of that object was such as to create an unreasonable danger for travelers on the highway" but distinguished those other cases as involving placement of fixed objects on public property rather than private property. (*Malkan, supra*, 258 N.E.2d at p. 696.) Where the pole (or other object) is on private property, the court determined

30.

"there should be no liability against the landowner, or his licensee, for an injury to a traveler arising out of a collision" with it. (*Ibid*.) The court explained that a contrary ruling would "severely restrict[] the property owner's use of his own land." (*Ibid*.)

The *Malkan* court concluded this "would impose an intolerable burden upon a property owner," would limit the landowner's use of the property, and "would be equivalent to a taking of private property for a public use without just compensation." (*Malkan*, *supra*, 258 N.E.2d at p. 696.) It determined a utility pole was not "a trap, *nor is any other visible, sizeable, above-the-surface structure*." (*Id*., at p. 697, italics added.) As a policy matter, the court concluded:

> "*It is the continuing duty of the State* or the municipality, *not the abutting landowners, to maintain the highways* and streets *in a reasonably safe condition* for ordinary use by the public…. *If the public right of way is too narrow*, because of objects on the abutting land, *the burden should fall upon the State to acquire additional property for its right of way and pay just compensation for it*. In the absence of regulating legislation, the adjoining landowner or his licensee should not be required to restrict the lawful use of his own property, or to use it at his peril." (*Malkan*, *supra*, 258 N.E.2d at p. 697, italics added.)

A similar holding was reached in *Hutchings v. Bauer* (1992) 149 Ill.2d 568 [599 N.E.2d 934]. There, the Supreme Court of Illinois considered whether operators of a horse training business breached a duty of care to the public by erecting a barrier on their land to prevent errant motorists from crashing through fencing that enclosed a frequently used training lane for horses. (*Id*., 599 N.E.2d at pp. 934–935.) The court wrote: "The defendants were under no duty to dedicate and donate their land to the public without compensation for use as a travelled way. To hold otherwise would constitute a denial of substantive due process under our Federal and State Constitutions." (*Id*., at pp. 935–936.)

The takings clauses in our state and federal Constitutions embody a fundamental public policy against appropriating private property for public use without payment of

31.

just compensation to the owner. Yet, plaintiffs are attempting to hold Union Pacific responsible for creating a clear recovery zone, which would preclude most uses of the property at issue by requiring that it remain largely unimproved and free of any substantial fixed objects. Such matters, by legislation, are the responsibility of Caltrans. (E.g., Sts. & Hy. Code, §§ 90-92, 143, subd. (f)(1)(A).) A finding of duty in cases such as this would largely have the same effect as a judgment of condemnation—except that no compensation would have been paid by the State. The burden to the property would last indefinitely (or as long as a clear recovery zone was needed for the adjacent portion of SR 99). And landowners whose property rights are so affected would likely experience a decline in their property's value if a portion of their property had to be dedicated to public use as a clear recovery zone and was divested of any (or most) viable economic uses. Relatedly, a prospective purchaser of such property would likely insist on a discounted price for the property should obstructions remain in place and require removal.

Recognition of such a duty would effectively result in a taking of property without just compensation. (See *Stop the Beach*, *supra*, 560 U.S. 702, 715; *Surfrider*, *supra*, 14 Cal.App.5th at p. 262.) In addition, the imposition of liability for breaching such a duty might well spawn inverse condemnation suits by private landowners against the State on the theory that their land was effectively taken for a public purpose.[17]

---

[17] A property owner whose land has been taken or damaged for public use without just compensation may initiate a lawsuit for inverse condemnation. (*Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 601.) "To state a cause of action for inverse condemnation, the property owner must show that there was a taking or damaging by a public entity of a valuable property right that the property owner possesses, that the taking or damaging was for a public use, and that the invasion or appropriation directly and specially affected the property owner to his or her injury. Property is 'taken or damaged' within the meaning of the California Constitution so as to give rise to a claim for inverse condemnation, when: (1) the property has been physically invaded in a tangible manner; (2) no physical invasion has occurred, but the property has been physically damaged; or (3) an intangible intrusion onto the property has occurred, which

We believe these policy considerations weigh heavily in favor of creating a judicial exception to the ordinary duty of care.

### 4. *Availability of Insurance*

Union Pacific contends recognizing a duty in situations similar to the case before us would likely cause an increase in the cost of homeowner's insurance especially for abutting landowners that live in rural areas. Plaintiffs contend California already recognizes the duty that Union Pacific seeks exemption from—i.e., the duty imposed by section 1714. Thus, plaintiffs contend, the costs of recognizing such a duty are already subsumed in the pricing of homeowner's insurance.

We have no evidence before us that indicates whether insurance companies already factor in potential liability in situations such as that before us, or whether insurance companies have operated under an assumption potential liability in such situations does not exist. Consequently, we cannot assess this factor in determining whether to create a judicial exception to section 1714.

## V. Summary

Although we are of the opinion the type of incident at issue in this lawsuit was foreseeable, we conclude public policy clearly weighs in favor of creating a judicial exception to the duty of care in this matter.

---

has caused no damage to the property but places a burden on the property that is direct, substantial, and peculiar to the property itself." (7 Miller & Starr, Cal. Real Estate (4th ed. 2024 update) Inverse Condemnation, § 23:1, fns. omitted.)

## DISPOSITION

The petition for writ of mandate is granted.  Let a writ of mandate issue directing the trial court to vacate its order denying Union Pacific Railroad Company's motion for summary judgment, and enter a new order granting the motion.  Petitioner is entitled to recover its costs in this proceeding.


SNAUFFER, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.

34.